# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **GHULAM ALI**, ) | |
| ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 17-cv-1899 (TSC) |
| ) | |
| **SCOTT PRUITT**, *United States* ) | |
| *Environmental Protection Agency*, ) | |
| ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION

This is *pro se* Plaintiff Ghulam Ali's third lawsuit against his employer, the Environmental Protection Agency (EPA). Ali alleges that the EPA not only retaliated against him for his prior litigation, but also discriminated against him because of his race, national origin, gender, age, and disability. *See* 42 U.S.C. § 2000e (Title VII); 29 U.S.C. §§ 701 *et seq.*, (Rehabilitation Act); 29 U.S.C. §§ 621 *et seq.* (Age Discrimination in Employment Act).[1] The EPA moves for summary judgment on all claims. (ECF No. 19.) Having reviewed the submissions of the parties and the record herein, and for the reasons set forth below, the court will GRANT the motion in part and

---

[1] Ali purports to bring his disability discrimination claim under the Americans with Disabilities Act (ADA). That claim is not actionable however, because Ali is an employee of the federal government, so his workplace disability claims are governed by the Rehabilitation Act. *See* 29 U.S.C. §§ 701 *et seq.*; *Barth v. Gelb*, 2 F.3d 1180, 1183 (D.C. Cir. 1993). When interpreting the Rehabilitation Act, courts rely on cases interpreting the ADA, as well as the EEOC's ADA regulations and enforcement guidance. *Schmidt v. Solis*, 891 F. Supp. 2d 72, 87 (D.D.C. 2012) (citations omitted).

Ali also cites the "Lily Ledbetter Fair Pay Act of 2009 (Pub. L. 111–2)" in his Complaint. (Compl. at 2.) To the extent he seeks to assert claims under this statute, his claims are not actionable because he has not alleged that he was paid less than similarly situated GS-13 persons outside of his protected groups.

DENY the motion in part without prejudice.

## I.  LEGAL STANDARDS

### A.  <u>Motions for Summary Judgment</u>

Summary judgment is appropriate where there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In determining whether a genuine issue of material fact exists, the court must view all facts in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The moving party bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted).  The nonmoving party, in response, must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).[2]  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (citations omitted).

---

[2]   The court previously warned Ali of the consequences of failing to respond to the EPA's Statement of Undisputed Facts (SOF) and provided him with a template for a response.  (ECF No. 21.)  Ali did not respond to the SOF.  Therefore, the court will treat the EPA's SOF as conceded except to the extent Ali points to portions of the record showing that the asserted fact is disputed.  *See* Local Civil Rule 7(h)(1) ("In determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.")

**B.** *Pro Se* **Litigants**

"Courts must construe *pro se* filings liberally." *Richardson v. United States*, 193 F.3d 545, 548 (D.C. Cir. 1999); *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (*pro se* pleadings should be held "to less stringent standards than formal pleadings drafted by lawyers."). Despite this standard, "a *pro se* plaintiff's opposition to a motion for summary judgment, like any other, must consist of more than mere unsupported allegations and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial." *Prunte v. Universal Music Grp., Inc.*, 699 F. Supp. 2d 15, 21–22 (D.D.C. 2010), *aff'd*, 425 Fed. App'x 1 (D.C. Cir. 2011) (citing Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324). As the non-moving party, a *pro se* plaintiff "is required to provide evidence that would permit a reasonable jury to find in his favor." *Prunte*, 699 F. Supp. 2d at 22 (internal quotations omitted) (citing *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987)).

**C.** **Discrimination Claims**

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color . . . sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Where, as here, a plaintiff has offered circumstantial evidence of Title VII discrimination, the court applies the familiar burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to determine whether summary judgment is appropriate. Under that framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Id*. at 802. In order to do so, a plaintiff must show that: (1) he belongs to a protected class under Title VII, (2) he experienced an adverse employment action, and (3) the adverse employment action "gives rise to an inference of discrimination." *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137, 144 (D.C. Cir.

2008) (internal citation omitted).  The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for taking the challenged employment action.  *Id.*  If an employer proffers such a reason, the burden reverts to the plaintiff to demonstrate that the employer's purported justification for the adverse employment action was merely a pretext for unlawful discrimination.  *Id.*

The D.C. Circuit has determined that the question of whether a plaintiff in a Title VII case has established a prima facie case is "almost always irrelevant."  *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008).  When "an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas.*"  *Id.* at 494 (emphasis in original).  The summary judgment analysis instead must focus on "one central question":

> Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was *not the actual reason* and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?

*Id.* (emphasis added).  This same paradigm applies to age and disability claims.  *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1155 (D.C. Cir. 2004) (the ADEA applies to individuals over 40); *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (Rehabilitation Act).

Even in the absence of a disparate treatment claim, an employee with a disability may still have a claim for failure to accommodate under the Rehabilitation Act, which requires that federal employers make "reasonable accommodation to the known physical or mental limitations of an applicant or employee who is a qualified individual with handicaps, unless the agency can demonstrate that the accommodation would impose an undue hardship on the operations of its program."  *Carr v. Reno*, 23 F.3d 525, 528–29 (D.C. Cir. 1994) (quoting 29 C.F.R. §

1614.203(c)(1)).

## II. ALI'S REQUEST FOR AN OFFICE

**A.  <u>Background</u>**

Ali is a male over forty years old, and of Pakistani national origin.  *Ali v. McCarthy*, 179 F. Supp. 3d 54, 67 (D.D.C. 2016), *aff'd sub nom. Ali v. Pruitt*, 727 F. App'x 692 (D.C. Cir. 2018).  He has filed several lawsuits against his employer, the EPA, beginning in the late 1990s, when he sued the agency for discrimination in promotions.  The complaint was dismissed as untimely.  *Ali*, 179 F. Supp. 3d at 61.

At all times relevant to this case, Ali was an economist in the EPA's Standards and Health Protection Division (SHPD).  (ECF No. 19, Def. SOF # 1.)  He suffers from allergies to multiple environmental compounds and claims that his allergies may result in, among other things, bleeding, itchy skin, rashes, face and arm swelling, as well as difficulty breathing, seeing, walking, and sleeping.  (Compl. at 10); *Ali*, 179 F. Supp. 3d at 67.  Because of his condition, Ali occupied a private office for many years through arrangements with his supervisor and through an EPA program that was not governed by the Rehabilitation Act.  *See id*. at 61–2, 67–68.  After a building renovation and space reallocation among various divisions, as well as Ali's transfer from the Engineering and Analysis Division (EAD) to SHPD, the EPA relocated him to a cubicle.  *Id*. at 61–63.  In his last lawsuit against the EPA, he claimed that he should have been allowed to remain in a private office as a reasonable accommodation for his condition, but this court granted the EPA's motion for summary judgment, finding that Ali had refused to submit specific medical information the EPA requested and had therefore abandoned the process for seeking relief under the Rehabilitation Act.  *Id.* at 67–82.

Ali testified that on or around the time he filed the last lawsuit, the EPA "forced" him to telework for approximately six months and the arrangement "became pretty nice," but the EPA later

rescinded the telework arrangement.  (*See* DEX 4, EEOC Tr. 45; DEX 7, Ali Dep. 95–97.)  At some point after he returned to the office, Ali occupied a cubicle near Bryan Goodwin, but relocated to a different cubicle because he became ill from Goodwin's strong "perfumes."  (Compl. at 8; ECF No. 22, Pl. Resp. at 2.)  Around 2007, Ali settled into a cubicle located in a "huge room with lots of cubicles" and experienced no "health issues" until the fall of 2011 when Goodwin moved near Ali's cubicle and he was again confronted with Goodwin's "perfumes."  (*See* EEOC Tr. 25–26, 133, 136; Ali Dep. 55.)

Ali contends that Goodwin's 2011 move was a result of the EPA's decision to convert Goodwin's office into a conference room in order to avoid forfeiting certain funds.  (Compl. at 5.)  Ali claims the office conversion was unnecessary because the EPA had enough conference rooms, it could have placed Goodwin in a cubicle elsewhere, and its failure to do so constituted retaliation, as well as discrimination based on Ali's disability, national origin, race, gender, and age.  (Compl. at 9, 11; ECF No. 22-2, ROI 1.)  Ali also claims that the EPA's failure to provide him with a private office was discriminatory for these same reasons.

In November 2011, before Goodwin's move, one of Ali's upper level managers, Evelyn Washington, emailed several managers, indicating that she had spoken to Goodwin about the "cologne issue" in the past and had recently told him to "tone [it] down because it was going to be a problem for the cube neighbors around him in the space" where he was moving.  (Def. SOF # 5; ECF No. 22-1, Pl. Ex. C-1.)  Washington also indicated that Ali and a female employee with asthma had already raised concerns about Goodwin's impending move, and another employee had asked to move because Goodwin's cologne made her nauseous.  (ECF No. 22-1, Pl. Ex. C-1.)

In mid-November 2011, after Goodwin's move, Ali emailed Washington:

I am getting allergic reaction in my cubicle.  I would like to be moved to an office space which is protective of health.  The longer I stayed in this space the worse it will get for me.  May be I can move to EAD or small conference room in SHPD.

(ECF No. 22-1, Pl. Ex. C-2.)  Washington immediately offered Ali alternative cubicles:

Is the source Bryan's cologne?  For an immediate remedy I can offer you to sit in one of the unoccupied cubes that is not in the section near Bryan.  Some . . . are soon to be occupied by another person. . . .  In the mean time we can implement a permanent solution.

The best option . . . is Antonio's cube. . . .  The second choice would be [near Ed Partington, but he would have to move].

(*Id.*)  The following day, Ali thanked Washington for her help, but explained:

Before the move, I have brought this issue to the management attention.  I was told if there would be a problem, Bryan will be moved to a different space.

I have talked to an individual about cubicle[s next to Antonio].  I was told that area is very perfumy.  Other cubicles are close to a printer, fumes from printers are very toxic to me.  I have looked into some other cubicles as well, they have problems of one kind or another.  I would like to move to some sort of a room instead of a cubicle.  I have long experience of cubicles.

(ECF No. 22-1, Pl. Ex. C-3.)

Ali's immediate supervisor Denise Hawkins denies telling Ali that she would move Goodwin in the event of a problem.  (ROI 165.)  She recalls that she informed Ali he needed to submit a formal request for accommodations.  (*See* ROI 116 # 20; EEOC Tr. 144-45.)

On January 18, 2012, pursuant to the Rehabilitation Act, Ali submitted a request for an accommodation in the form of a "[p]rivate office with 4 walls to the ceiling and a door that opens and closes."  (DEX 8.)  He explained his reason for the request was "[s]kin and internal swelling in cubicles; allergic reaction to cubicle environment."  (*Id.*)  It appears that along with his request, he submitted many of the same documents that the EPA had previously rejected when he filed his last

lawsuit: one undated physician letter, as well as a letter from 2000 and one from 2007.  (*See* ROI 115; ROI 80–82); *Ali*, 179 F. Supp. 3d at 70–71.

Hawkins requested updated documentation, and Ali submitted a March 7 letter from Dr. Asha Vali indicating, *inter alia*, that Ali suffered adverse reactions to "environmental allergens" and that "[i]t may be advisable for him to limit this occupational exposure to the allergies in an isolated office environment."  (ROI 83; ROI 115 # 16.)  Because she found the letter "vague," Hawkins requested additional information, and on May 17, Ali submitted a letter dated May 10 from Dr. Vali.  (ROI 84; ROI 115 # 16; ROI 166 # 11; EEOC Tr. 145; Def. SOF # 7.)  In this letter, Dr. Vali explained that Ali "suffers from multiple allergies due to . . . not only environmental allergens but also volatile organic compounds and products like paint, petroleum derivatives, perfumes, and any kind of fragrances or odors and several other materials."  (ROI 84.)  Dr. Vali further explained that Ali's allergies could "lead to chronic diseases like asthma, chronic dermatitis and severe effects on the immune system," and that "multiple medications had failed to alleviate his symptoms."  (DEX 9; Def. SOF # 7; EEOC Tr. 145.)  Consequently, Dr. Vali determined that "it may be advisable for [Ali] to limit his occupational exposure to all allergens in an isolated office environment."  (ROI 84; DEX 9.)

Ali claims that around this time the EPA told him it would provide him with a private office.  (Compl. at 6.)  Indeed, an EEO investigator's report indicates that Hawkins said she had originally agreed it would be appropriate for Ali to work in a private office, but she needed to confer with her managers.  (ROI 47, 119.)  According to the report, both her immediate supervisor Sara Hisel-McCoy (SHPD Director) and another manager, Jeff Lape, approved the request.  (ROI 47–48, 210; *see* ROI 209.)  Hawkins reportedly claimed Lape obtained estimates for constructing an office, but Mike Shapiro (Principal Deputy Assistant Administrator) rejected the idea.  (ROI 47-48, 173.)  In her subsequent EEO Affidavit, Hawkins painted a slightly different picture, claiming that she and McCoy

consulted with Lape, who consulted with Shapiro, but the feedback Hawkins received from McCoy was that Shapiro was not in favor of providing a private office.  (ROI 119 # 47.)  McCoy testified that she only remembers talking with Lape to determine if constructing a room was possible.  (EEOC Tr. 210, 213.)

Lape and Shapiro remembered things differently.  Lape did not recall rejecting the separate office accommodation, but says Hawkins asked him "in passing" his thoughts on building a separate office for Ali because of air quality concerns, and he questioned how a separate office would improve Ali's air quality when he would not be "separate and apart from the existing air or have a dedicated air supply."  (ROI 211–12.)  Lape said he wanted to be certain that the EPA did not "get to the end of the process and then have the employee say nothing's changed."  (ROI 211–12.)  Shapiro claimed he did not recall receiving Ali's accommodation request or being involved in the decision to deny his private office request.  (ROI 175.)

In any event, on June 21, Hawkins informed Ali in writing that the EPA was offering him full-time telework as an accommodation and explained that "[i]f the implemented accommodation is determined to be ineffective [the Agency] will consider other accommodations that may be effective." (DEX 9 at 2; DEX 10.)  Hawkins later testified that she determined that telework would be the most effective accommodation for Ali because the "HVAC system at EPA is a shared system.  It doesn't make any difference whether you are in a cubicle or whether you are in a private office, it's all the same air that everyone is breathing."  (EEOC Tr. 146–47; ROI 116 # 23.)  Moreover, by working at home Ali could avoid "common spaces (pantry, hallways, bathroom) where he is also exposed to the indoor air."  (ROI 116 # 23; EEOC Tr. 147.)  McCoy testified that she viewed working from home as a better option for Ali because he had worked from home previously.  (EEOC Tr. 219–20.)

Ali rejected the telework offer on June 28, 2012:

I thought about working from home.  It is not a good option.  So please get me a room
it is crucial for my health.  May be I can be given an office space in EAD, my old
room is an option.

(DEX 12; Ali Dep. 94.)

Several weeks later, on July 5, 2012, Ali again emailed management, this time complaining

that the EPA was taking too long, that his health continued to worsen in the cubicle, and renewing his

request for a private office.  (ECF No. 22-1, Pl. Ex. C-5.)  Several days later he sent another email

indicating that a small conference room was a "possible option[] (at least for the time being)."  (ECF

No. 22-1, Pl. Ex. C-6.)

 On August 23, 2012, Federal Occupational Health conducted an air quality assessment which

showed no significant difference in the air quality between a closed office and cubicles in Ali's

workspace.  (DEX 13.)  Sometime afterwards, Hawkins offered to provide Ali with air filters for his

cubicle.  (ROI 119 # 51.)  In December 2012, Ali emailed management, explaining that he had

repeatedly asked Goodwin to stop wearing or bringing "perfumes, etc." into the office space, but

Goodwin refused to comply.  (ECF No. 22-1, Pl. Ex. C-4.)  Ali further explained that fragrances were

"poisoning" him and he planned to take time off.  (ECF No. 22-1, Pl. Ex. C-4.)  He also asked

Washington to ask Goodwin to stop using fragranced products or to relocate him.  (*Id.*)

The following month, Ali again emailed Washington and McCoy:

I just wanted to bring to your attention that EAD has two empty rooms. . . .  One staff
member has left the Division permanently.  I will appreciate if you can ask EAD
management to let me use the room.  I do not have any reasonable office space. I will
appreciate your help.

(ECF No. 22-1, Pl. Ex. C-7.)

By March 2013, Ali had apparently changed cubicles, because he emailed Washington and

McCoy complaining about an intern, "Noah," and requested that McCoy ask Noah to stop using

scented products or relocate Noah to another cubicle.  (ECF No. 22-1, Pl. Ex. C-8.)  McCoy

responded that Ali had declined the EPA's telework accommodation and said that although she was

willing to reopen discussions about the accommodations request, she did "not understand how asking

Noah to move his cubicle . . . would help the situation.  The other cubicle shares the same common

space and recirculated air.  Nonetheless, Noah may move to another cubicle as a result of space

selection but all cubicles in SHPD space share the same common space and recirculated air."  (*Id.*)[3]

Ali responded approximately one week later, but did not explain why he was rejecting the

telework offer:

> I would be glad to discuss or settle the issues.
>
> Closer the source of contaminates the worst it is, because concentration of
> contaminants is very high in the air closest to the source.  As the distance increases
> from the source of contaminants, the concentration of the chemicals in the air
> decreases.  If someone is sitting a few feet away from the individual wearing perfumes
> for instance, it is extremely dangerous situation because of continuous high exposure
> to the harmful chemicals.

(ECF No. 22-1, Pl. Ex. C-8.)

> More than a year later, on June 12, 2014, Ali emailed McCoy:
>
> I understood there was extra office space in EAD which would be occupied by others.
> I have greater need of an office (a room) because of allergic reaction in my cubicle.  I
> will appreciate if I can be given an office in EAD. . . .  I should mention that I used to
> be in EAD for a long time without any health problem. . . .
>
> In addition, there is a room . . . in SHP which has not been occupied for a long time.  I
> should be given this room if there is no other office.
>
> I appreciate your help.

(ECF No. 22-1, Pl. Ex. C-9.)  Hawkins later testified that she did not inquire about a room in EAD: "I

personally did not consider that.  It was a different division.  I had nothing to do with their space

---

[3]  McCoy testified that the EPA discussed the matter with Noah and he ultimately "changed his
fragrance."  (EEOC Tr. 200.)

allocation.  It was not within my purview to decide how they should use their space."  (EEOC Tr. 182–83.)  She said that had SHPD encountered any opposition from EAD, McCoy would have had to take the matter to the Office Director.  (*Id.* at 184.)  McCoy testified that because she knew that Ali wanted a private office, when SHPD and EAD were later reorganized, Ali was transferred out of SHPD back to EAD and given a private office.  (*Id.* at 225–26.)

Ali brings a failure to accommodate claim for the EPA's earlier decision not to provide him a private office.  He also brings retaliation and hostile work environment claims, and disparate treatment claims based on age, gender, race, national origin, and disability with respect to the denial of his office request.  (*See* EEOC Tr. 42, 61–66; Compl. at 1–2.)

## B.  <u>Legal Standard</u>

At issue in Ali's last case and this one is whether he or the EPA was to blame for the breakdown of the parties' discussions regarding Ali's request for a private office.  The Rehabilitation Act regulations state:

> To determine the appropriate reasonable accommodation it may be necessary for the [agency] to initiate an informal, interactive process with the individual with a disability in need of the accommodation.  This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

*Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014) (citing 29 C.F.R. § 1630.2(o)(3)) (some citations omitted).  As the D.C. Circuit has explained, the Rehabilitation Act "contemplates an interactive process, 29 C.F.R. § 1630.2(o)(3)—that is, a flexible give-and-take between employer and employee so that together they can determine what accommodation would enable the employee to continue working."  *Ali*, 727 F. App'x at 695 (citation and internal quotations omitted).

In determining which party is to blame for a failure of the interactive process, courts must consider that

neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability.  Thus, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary.  A party that obstructs or delays the interactive process is not acting in good faith.

*Ward*, 762 F.3d at 32 (citations and internal quotations omitted).

**C.  <u>Analysis</u>**

    a.  <u>Rehabilitation Act Reasonable Accommodation Claim</u>

The EPA argues that Ali's reasonable accommodation claim fails because SHPD had no private offices available[4] and it offered Ali three reasonable accommodation options (relocating to an alternative cubicle, full-time telework, and an air filter), all of which he refused.  The EPA argues that given its efforts to accommodate Ali, it engaged in the interactive process in good faith.  It correctly notes that under the law of this Circuit, an employee is not entitled to their preferred accommodation, but a reasonable one.  *See Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1304 (D.C. Cir. 1998). Similarly, the EEOC's implementing guidance specifies that "the employer providing the accommodation has the ultimate discretion to choose between effective accommodations and may choose the less expensive accommodation or the accommodation that is easier for it to provide." U.S. Equal Emp. Opportunity Comm'n, Interpretive Guidance on Title I of the Americans with Disabilities Act, *reprinted in* 29 C.F.R. § 1630 app. at 377 (2004); *see Schmidt*, 891 F. Supp. 2d at 87 (applying ADA EEOC interpretive guidance in Rehabilitation Act cases).

The EPA argues that it first tried to accommodate Ali's condition by offering him the opportunity to change cubicles, which Ali refused.  (ECF No. 19, Def. Br. at 7; DEX 6; EEOC Tr. 148.)  This argument implies that Ali rejected the offer outright; that implication is contradicted by

---

[4]  Ali disputes Hawkins' and McCoy's testimony that SHPD had no vacant private offices, (EEO Tr. 182, 217), claiming that Grace Robiou's office was available.  (Pl. Resp. at 17–18.)  As discussed below, however, the record does not support his assertion, nor is Robiou an appropriate comparator.

the record.  The day after Washington offered Antonio's cubicle as a replacement, Ali responded that

he had spoken to another employee, who said the area was "very perfumy."  (ECF No. 22-1, Pl. Ex.

C-3; Ali Dep. 106.)  Ali also explained that he had "looked into some other cubicles as well," but

they all had problems of one kind or another.  (ECF No. 22-1, Pl. Ex. C-3.)  Indeed, Ali testified

during his EEOC hearing that he tested several alternatives, and his emails confirm he tested at least

one cubicle near "Noah."  (EEOC Tr. 49-50, 54–55; Ali Dep. 106–07; ECF No. 22-1, Pl. Ex. C-8.)

At some point employees were given the opportunity to pick new cubicles based on their pay grade

and other factors.  (EEOC Tr. 50–52; Ali Dep. 106–07.)  Because Ali was then trying out a new

cubicle and no one else picked his cubicle, he stayed in place rather than move.  (Ali Dep. 106–07.)

Viewing the facts in the light most favorable to Ali, the court finds that he did not reject the EPA's

offer to relocate to another cubicle, but instead began investigating and testing other cubicle options,

and therefore did not stop participating in the interactive process.[5]

Shortly after Ali submitted his final physician's letter, the EPA again engaged in the

interactive process by offering him full-time telework; a reasonable offer given Dr. Vali's

recommendation that Ali "limit his occupational exposure to all allergens in an isolated office

environment."  (ROI 84; DEX 9.)  At this point the interactive process broke down: without

explanation, Ali rejected telework as "not a good option."  (DEX 12; Ali Dep. 94).  While Ali did

mention in one email that printer emissions at the office might be harmful to him, he did not claim (as

he now does) that using a single printer in his four-bedroom home—that he shares only with his

wife—would have been problematic.  (ECF No. 22-1, Pl. Ex. C-3; *see* ROI 119 # 50; Ali Dep. 98.)

---

[5]  Ali claims that his condition ultimately worsened to the point where occupying a cubicle was no
longer a viable option, but there is no evidence that he informed the EPA of this development.
(Compl. at 8–9.)

Moreover, in offering Ali the telework option, the EPA was aware that he had worked from home previously without any apparent problems and it indicated a willingness to discuss other accommodations: "[i]f the implemented accommodation is determined to be ineffective [the Agency] will consider other accommodations that may be effective." (DEX 9 at 2; DEX 10.) Indeed, after Ali emailed McCoy asking her to speak to Noah about his scented products, McCoy offered to reopen the discussion about the telework option, which would have provided Ali an opportunity to explain his reasons for rejecting the offer. (ECF No. 22-1, Pl. Ex. C-8.) Instead, Ali explained why he wanted the EPA to move Noah to another cubicle, and reiterated his request for a private office, asking that the agency convert various spaces into offices and that his SHPD supervisors consult with EAD about allowing him to use their space. (*Id.*)

There is nothing in the record to support Ali's contention that Hawkins "knew full well [he] could not work from home." (Compl. at 7.) When asked during his deposition whether he had engaged in further conversations or provided additional written responses to the EPA about the telework offer, Ali testified that he did not recall doing so. (Ali Dep. 114–15.) Hawkins also testified that Ali did not mention his reasons for declining the telework offer. (ROI 119 # 50.) The Rehabilitation Act does not require employers to investigate alternative accommodations without first understanding why an employee has rejected the accommodation(s) already offered. This is particularly so where the offered accommodations have been effective in the past—or where the employer has no evidence that they were ineffective.

Accordingly, the court finds that Ali failed to act in good faith during the interactive process. As the D.C. Circuit explained:

> A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility. For instance, when the parties are missing information

that can only be provided by one of the parties, the party withholding the information
may be found to have obstructed the process.

*Ward*, 762 F.3d at 32 (citations omitted). [6]

Ali argues that he does not have to show that his "home is not [a] reasonable" alternative.  (Pl.
Resp. at 23.)  But, his unwillingness to explain his rejection of the telework offer is inconsistent with
the "interactive process" the D.C. Circuit has explained the Rehabilitation Act contemplates: "that is,
a flexible give-and-take between employer and employee so that together they can determine what
accommodation would enable the employee to continue working."  *Ali*, 727 F. App'x at 695 (citing
29 C.F.R. § 1630.2(o)(3)) (internal quotations and some citations omitted).

The breakdown in that process here is similar to what occurred in *Loulseged v. Akzo Nobel
Inc.*, 178 F.3d 731, 732–37 (5th Cir. 1999), where the employer revoked previously effective
accommodations due to disruptions in production and increased costs, but later proposed alternative
arrangements.  The plaintiff then resigned without explaining her objections to the new plan.  *Id*. at

---

[6]  Ali's cites to numerous cases, arguing that "[a]lthough not always, the courts have rejected
working from home accommodations as unreasonable."  (Pl. Resp. at 6, 10.)  Those cases, however,
involved Plaintiffs who *requested* telework or unlimited leave, but their jobs required onsite
attendance.  *See, e.g.*, *EEOC v. Ford*, 782 F.3d 753, 757, 759 (6th Cir. 2015) (affirming summary
judgment for the employer where plaintiff sought telework for medical reasons, but her job was
"highly interactive" and her previous attempts at telework were unsuccessful); *EEOC v. Yellow
Freight Sys.*, *Inc.*, 253 F.3d 943, 945–46, 948 (7th Cir. 2001) (affirming summary judgment for the
employer where a dock worker, whose job required loading and unloading freight cars, failed to
complete the required ADA accommodations paperwork, had a "woeful" attendance record, and
sought to use sick days as needed "without being penalized.").
    Ali also mistakenly relies on cases in which the employer caused the breakdown in the interactive
process by refusing to consider the employee's recommendations and/or refusing to offer alternative
accommodations to employees with allergies and chemical sensitivities.  (Pl. Resp. at 7–13) (*citing
e.g.*, *Davis v. Utah*, 96 F. Supp. 2d 1271 (D. Utah 2001) (denying summary judgment for the
employer where the plaintiff could not be moved to another location due to the confidential nature of
her work, but the employer accused Plaintiff of "hyperventilating" and refused to consider alternative
accommodations);  *Muovich v. Raleigh Cnty. Bd. of Educ.,* 58 Fed. App'x 584 (2003) (affirming jury
verdict for chemically sensitive teacher after a school official told her she was "nuts" and ignored her
requests for accommodations).

732–34.  The trial court granted the employer's motion for a directed verdict.  In affirming, the Fifth

Circuit noted:

> One cannot negotiate with a brick wall.  While [Plaintiff] now goes into great detail
> about the manifest injustice of the [alternative proposal], she failed to vocalize any of
> these concerns at the time she allegedly realized that she was expected to use the
> [new plan].

*Id*. at 737.

Here too, the EPA's efforts to engage in the interactive process were stymied by Ali's refusal

to explain why telework was not a viable accommodation.  Furthermore, like the plaintiff in

*Loulseged*, Ali offers post-hoc explanations for rejecting the EPA's offered accommodation: he

believes that telework reduces opportunities for advancement because management purportedly does

not value this arrangement and it limits the employee's contact with other workers; he needs access to

the EPA library; and he needs to print journal articles to conduct research, but printing them at home

exposes him to printer emissions, to which he was allergic.[7]  (*See* Pl. Resp. at 5; *see, e.g.*, ROI 119 #

50.)  Ali's purported reasons for rejecting the telework offer,[8] are insufficient to establish liability

where he failed to share his concerns with the EPA at the time it was considering his

accommodations request.  Moreover, there is no evidence in the record that Ali would have been

unable to use the library, obtain access to printed journal articles or that telework lessened the

likelihood for promotion.  (*See* ROI 119 # 50; EEOC Tr. 185.)

---

[7]  There is no documentation in the record that having a printer in his home was medically
inadvisable.

[8]  In his response to the Motion for Summary Judgment, Ali did not reference his deposition
testimony that his wife refused to allow him to work from home and did not want his work computer
there.  (Ali Dep. 100–03.)

Ali finally argues that the EPA's purported delay in making the reasonable accommodation offer violated the Rehabilitation Act. (Pl. Resp. at 11.) While "a long-delayed accommodation" can be considered a violation of the statute, *Mogenhan v. Napolitano*, 613 F.3d 1162, 1168 (D.C. Cir. 2010) (citation omitted), there is no evidence of delay here. Ali submitted his accommodation request in January 2012 with the same physician letters that the EPA had previously rejected, and submitted another letter in March. It was not unreasonable for the agency to request more information because although Ali claimed a sensitivity to perfumes and fragrances, the physicians' letters addressed only "environmental allergens" or "environmental irritants." (ROI 82–83.) Yet Ali did not provide another letter addressing his fragrance sensitivity until mid-May, and approximately one month later the EPA made the telework offer. (ROI 84; ROI 115 # 16; ROI 166 # 11; EEOC Tr. 145; DEX 10; Def. SOF # 7.) The court finds no fault with the EPA's response or its timeliness.[9]

   b.   <u>Discrimination, Retaliation & Hostile Work Environment Claims</u>

      i.   *Discrimination*

Ali claims that Hawkins and McCoy discriminated against him on the basis of his disability, age,[10] gender, national origin, and race. Goodwin, Hawkins, and Washington are African-American, while McCoy is Caucasian. (Def. SOF # 2; EEOC Tr. 62.) Ali first maintains that his African-

---

[9]  Ali cites *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002), to support his contention that the EPA had a duty to alter its policies to accommodate him, even going so far as to suggest that the EPA should have displaced a SHPD supervisor from their office. (Pl. Resp. at 18.) The court need not reach this question because, again, the EPA was not obligated to unilaterally investigate Ali's proposed alternatives, under these circumstances.

[10]  Although the fact is not dispositive, McCoy was over 40 and Washington was over 60 when the events at issue occurred. (Def. SOF # 2; EEOC Tr. 141, 193); *see Carter v. Bridenstine*, No. CV 17-1752 (ABJ), 2020 WL 1536250, at *14 (D.D.C. Mar. 31, 2020) (noting that discrimination claims may be "suspect" where the decision maker and the plaintiff are in the same protected class) (citations omitted).

American supervisors deliberately placed Goodwin next to Ali's cubicle and refused to move Goodwin because of discriminatory animus.  (Compl. at 9; Pl. Resp. at 2, 28–29) ("Not only Deputy Director but also Denise Hawkins are black.  They give preference to another staff member of their own kind (Bryan Goodwin is black), over my health problems.").

These allegations are insufficient to create an inference of discrimination.  Ali's email evidence shows that Goodwin's cubicle location impacted Ali as well as two other employees.  (ECF No. 22-1, Pl. Ex. C-1.)  Moreover, given Ali's testimony that Goodwin's fragrances were powerful enough to fill up a large room and he left "a trail of perfumes behind just by passing by," (Pl. Resp. at 14) (*citing* Ali Dep. 111–14), it appears that Goodwin's presence impacted other employees as well.  Thus, there is no evidence that the Agency targeted Ali or treated other employees more favorably.[11]

More importantly, Ali has not adduced evidence that his supervisors were responsible for placing Goodwin's cubicle next to Ali.  According to Ali, when management decided to convert the room where Goodwin originally sat into a conference room, Goodwin resisted the move.  (Compl. at 5; *see* EEOC Tr. 160–61.)  However, once the EPA forced Goodwin to relocate, Ali's testimony is that Goodwin "*took* the small cubicle directly behind" Ali and "management *let*" Goodwin select that cubicle.  (EEOC Tr. 31–32, 53) ("Goodwin . . . picked the cubicle behind me.") (emphasis added).  Likewise, Washington's email regarding management's discussions with Goodwin about his fragrances and the impending move begins: "I spoke with [Bryan] recently about it on Oct 13, the same day I confirmed with him *his* cubicle selection."  (ECF No. 22-1, Pl. Ex. C-1) (emphasis added).

---

[11]   Hawkins testified that the EPA consulted with its labor relations department about whether it could order Goodwin to stop using scented products and was informed that individual employees could not be singled out, as long they were "clean and hygienic."  (EEOC Tr. 172–73.)  McCoy also testified that the EPA eventually explored whether it could mandate a fragrance-free workspace but had not reached a decision on whether to do so.  (EEOC Tr. 214.)

Moreover, when asked about the cubicle reallocation procedures, Hawkins testified:

> There was a specific process that involves the union that you follow when you want to reallocate space.  It involves notifying the people who are affected, notifying the union, giving people an opportunity to indicate which space they want to move to, reallocating the space, showing it to the unions again, and coming up with a final reallocation.

(EEOC Tr. 151–52.)  And, when asked about Ali's request that she relocate Noah, McCoy testified that it is "not normally [the EPA's] practice to move people around other than under the union agreement."  (EEOC Tr. 200.)  Thus, there is no evidence that Goodwin's relocation next to Ali was orchestrated by his supervisors, nor motivated by discriminatory intent.

Ali also claims that the EPA's telework offer was discriminatory: "I do not know any recent case where EPA has forced any other employee (white or younger) to use his home as the office.  Its forcing me to use home as an office is a discrimination."  (Pl. Resp. at 22–23.)

The option to telework is generally viewed as a perquisite, not a punishment, and here it provided an effective solution to Ali's request for an accommodation.  Even if Ali viewed teleworking negatively, he presented no evidence that an employee who was younger or of a different race sought a similar accommodation and was treated more favorably.  *See Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (comparator evidence requires a showing that "all of the relevant aspects" of the plaintiff's "employment situation were nearly identical to those of the other employee[s].") (citations and internal quotation marks omitted).

To the extent Ali relies on Grace Robiou as a comparator, his argument fails.  (Pl. Resp. at 17–18; Ali Dep. 109) ("One girl wanted to have a cubicle in the sun.  She was given preference to pick cubicle above anybody else. . . . ")  Robiou, a Branch Chief, was assigned to an office, but requested relocation to a cubicle near a window as an accommodation for her Seasonal Affective Disorder.  (EEOC Tr. 224.)  McCoy testified that although Robiou did not occupy her office full-

time, McCoy believed "that a supervisor needs an office so they can have private conversations with employees that the whole world can't hear, necessarily.  So that was always technically her office as well.  So there was no—when she wasn't using it, other people would use it as an extra meeting space."  (EEOC Tr. 224–25.)  As a supervisor, Robiou is not an appropriate comparator and the EPA had valid non-discriminatory reasons for not assigning her office to Ali.  Nor is Ali's opinion that the SHPD had enough conference rooms and did not need to use Robiou's office for meetings evidence of discriminatory intent.

Likewise, Ali has not shown that the EPA acted with discriminatory intent in assigning Grace Richardson to an office in EAD.  (Pl. Resp. at 20.)  Ali argues that Richardson, who was not a permanent EPA employee, could have been placed in his cubicle and he could have been assigned the private office in EAD, and the agency's failure to do so "shows that the Agency gave preference to white and younger female over" him.  (*Id.*)  The EPA did not address this argument directly, but instead relied on Hawkins' testimony that she could not move Ali to EAD because she had no control over allocation of space in another division.  (ECF No. 23, Def. Reply at 3 n.3.)

This explanation is unpersuasive, and had the circumstances been different, a fact finder might conclude that a reasonable course of conduct would have been to at least inquire about using EAD space once Ali asked his supervisors to do so.  But Ali's purported discrimination claim is inextricably tied to his accommodation claim.  Because the EPA did not act unreasonably in responding to Ali's accommodation request—given his failure to communicate critical information during the interactive process—there is no basis on which to find that the EPA was motivated by discriminatory animus because it did not inquire about using EAD space.  The EPA had no obligation to shuffle employees among offices absent any explanation from Ali about why telework was not a

satisfactory accommodation.[12]  Moreover, Ali did not provide enough information about Richardson

to establish that she is an appropriate comparator.

Next, Ali argues that the EPA's "shifting of blame" for denying his private office request is

evidence of pretext.  (Pl. Resp. at 17.)  But the fact that different employees have different

recollections about why Ali was denied a private office does not establish pretext because it does not

suggest that the telework offer was unreasonable or that the EPA's reason for making the offer was

motivated by discriminatory animus.  Moreover, there is no evidence that someone outside of Ali's

protected class was treated more favorably.  Regardless of who decided not to build out a separate

office for Ali, and whether the decision was based on cost or concerns about the air circulation

system, it was not unreasonable for the EPA to offer telework as an alternative when Ali did not tell

the EPA why telework was an unsatisfactory accommodation.[13]

    *ii.  Retaliation*

To prevail on a retaliation claim "the plaintiff generally must establish that he or she suffered (i)

a materially adverse action (ii) because he or she had brought or threatened to bring a discrimination

claim."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 (D.C. Cir. 2008).  The *McDonnell Douglas*

paradigm, which requires an employee to produce evidence of pretext, also applies to retaliation claims.

*Holcomb v. Powell*, 433 F.3d 889, 901 (D.C. Cir. 2006).

Ali has not pointed to evidence showing that the EPA's non-discriminatory reason for making

the telework offer was "not the actual reason" for the offer or that it was otherwise a pretext for

---

[12]  The same reasoning applies to Ali's argument that the EPA could have converted a small storage room into a private office for him or converted one of its conference rooms to an office.

[13]  Ali faults the EPA for not producing, during discovery, the cost estimates for building a private office and asks this court to impose sanctions.  (Pl. Resp. at 17.)  The court declines to do so because this evidence would not have changed its decision, and the court's scheduling order, (ECF No. 9), required the parties to notify the court of any discovery disputes before filing a motion to compel. Ali never notified the court of any dispute regarding production of the cost estimates.

discrimination.  *Brady*, 520 F.3d at 493.  In addition, the EPA's failure to give Ali his requested accommodation is not evidence of retaliation where he has no appropriate comparators and he was the cause of the breakdown in the interactive process.

<em>iii.  Hostile Work Environment</em>

Ali relies on the entire chain of events regarding his quest for a private office to establish his hostile work environment claim: Goodwin's relocation, the EPA's "failure" to move Goodwin, the EPA's offer of "forced" telework, Ali's "intentional" exposure to toxic fumes, and the EPA's refusal to provide him with a private office.  (Compl. at 10; Pl. Resp. at 29–30.)

A plaintiff may prevail on a hostile work environment claim if he can show "his employer subjected him to discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Baloch*, 550 F.3d at 1201 (internal quotation marks and citations omitted).  The court evaluates the existence of a hostile work environment by considering "the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance."  *Id.* (*citing Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)).

Having considered the totality of the circumstances, the court finds that Ali has not shown that the EPA created a hostile work environment.  First, his assertion that the EPA's conduct was the equivalent of "spraying toxic materials in [his] office cubicle" is hyperbole.  (*See* Pl. Resp. at 29.) His refusal to accept the EPA's telework offer or to explain why it was unacceptable resulted in his

continued exposure to fragrances and other allergens.  Thus, his hostile work environment claim

associated with his request for accommodations fails.[14]

### III. TRAINING

Ali alleges that Hawkins has been "against" him since she began supervising him in 2009, and

that her decision to deny his request for funding to attend outside trainings and conferences was

discriminatory.  (Compl. at 11.)  The court will grant the EPA summary judgment on this claim.

The EPA explains that Ali's division approves funding for travel to conferences only if the

employee will be "presenting papers or posters or otherwise ha[s] a leadership role (*e.g.*, chairing a

session)."  (DEX 15.)  In its SOF, the EPA asserts that in 2012, all but one of ten employees in Ali's

division who attended conferences presented a paper and the one who did not present attended a local

conference, with no travel expenses.  (Def. SOF # 12; DEX 14.)

Ali does not challenge the EPA's assertions, but argues that "Division staff members travel to

attend conferences without presenting papers," (Pl. Resp. at 31), an unsupported allegation that is not

enough to create a genuine issue of material fact or raise an inference of discrimination.

Ali argues that he should be allowed to attend trainings for professional development, and he

claims in his reply brief that the SHPD policy disparately impacts him.  (*Id.* at 30–31.)  He explains

that he cannot present papers at conferences because "it requires not only significant amount of time

but also intellectual effort.  The conference requires writing of articles for long time in advance in

---

[14]   Ali's hostile work environment claim also fails insofar as it relates to his allegations that he was
denied training, a team leader position, and cost-benefit economic work because, as discussed below,
two of those claims do not survive summary judgment.  Moreover, even if they did, there is no
evidence that he experienced "discriminatory intimidation, ridicule, and insult that [wa]s sufficiently
severe or pervasive to alter the conditions of his employment and create an abusive working
environment."  *Baloch*, 550 F.3d at 1201 (internal quotation marks and citations omitted).  Although
Ali may have believed he was being targeted and harassed, the hostile work environment standard is
an objective one, *Baloch*, 550 F.3d at 1201, and no reasonable fact finder could find a hostile work
environment based on the record here.

economics.  The criteria of acceptance of an article for presentation at the conference is very high

which was difficult for me to meet."  (*Id.* at 31.)  He also alleges that "the other two branches" in

SHPD do not apply the same training reimbursement policy.  (*Id.* at 30–31.)

Ali's argument is unavailing.  First, he did not raise a disparate impact claim in his Complaint,

and he cannot amend it by way of responsive brief—particularly after the close of discovery—to

include such a claim.  *See Smith v. Mayor*, 191 F. Supp. 3d 114, 116–17 (D.D.C. 2016), *aff'd sub*

*nom. Smith v. Mayor, D.C.*, No. 16-7109, 2017 WL 2193615 (D.C. Cir. May 19, 2017).  Even if he

were allowed to amend, the claim would fail because there is no evidence in the record that the EPA

uses a neutral employment practice that not only has a disparate impact on the basis of *protected*

*class*, but that also has no business necessity, or that the EPA failed to adopt an alternative

employment practice with less impact.  *See Ricci v. DeStefano*, 557 U.S. 557, 578 (2009) (explaining

that a plaintiff establishes a disparate impact claim where he can point to a facially neutral policy

"that causes a disparate impact on the basis of race, color, religion, sex, or national origin," the

employer may rebut by establishing that the policy "is job related" and "consistent with business

necessity," but "a plaintiff may still succeed by showing that the employer refuses to adopt an

available alternative employment practice that has less disparate impact and serves the employer's

legitimate needs.") (citing 42 U.S.C. § 2000e-2(k)(1)(A), (C)).

### IV. COST-BENEFIT ECONOMIC ANALYSIS WORK

Ali asserts that "similarly situated individuals" were assigned cost-benefit analysis work,

while he was assigned a few small projects that he designed and on which he persuaded the EPA to

allow him to work.  (Compl. at 12–14.)  He claims he is the only economist in the division and

therefore should have been assigned cost-benefit assignments, but that such work was assigned to

younger, mostly female Caucasian employees.  (*Id*. at 13–14.)  Ali asserts that his opportunities for

Page 25 of 29

advancement have been hindered by the EPA's failure to assign him cost-benefit work and all but "two or maybe three" other employees in his division are at a higher pay grade than he. (*Id*. at 14.) He appears to name Karen Milam and Gary Russo as comparators. (*Id*. at 12–13.)

In her written response during the EEO administrative proceedings, Hawkins indicated that she was unaware Ali was denied any cost-benefit assignments, and she listed more than half a dozen examples of cost-benefit assignments on which he had worked. (ROI 116 # 24; ROI 117 # 29.) In its brief, the EPA points out that Ali's division does not have many opportunities to perform cost-benefit work. (Def. Br. at 9.) It also argues that Ali's comparators are not similarly situated because Milam (who is also an economist) is in another division and Russo (a biologist) was in a different branch. (*Id*. at 9 n.1.)

In his response, Ali directs the court to his deposition testimony, as well as the affidavits of Shari Barash and Lars Wilcut. (Pl. Resp. at 31–32) (*citing* ROI 203 # 32; ROI 241 # 32; Ali Dep. 82–83.) At first blush, this evidence appears to support the EPA's position that cost-benefit work was assigned to persons outside Ali's branch/division and therefore Barash and Wilcut are not appropriate comparators. (*See* ROI 203 # 30, 32; ROI 241 #32.) But Ali testified that "projects can be distributed among people. It is not confined to one section or just – you can rotate within a division." (Ali Dep. 82–84.) Thus, his testimony contradicts the EPA's position that Ali cannot compare his work assignments to Barash and Wilcut's.

The court is unable to resolve this claim on summary judgment because neither party has supported or explained its contentions. The EPA did not provide citations to the record to support its assertion about the amount of cost-benefit work in Ali's division, and did not address Ali's claim that he should have been assigned the work instead of non-economists, or that assignments were distributed among "people," "sections," and "branches." (Ali Dep. 82–84.) On the other hand, Ali

pointed to no evidence that he actually suffered an adverse employment action by not receiving cost-benefit work. Moreover, the parties compare Ali to others in his branch, division and office, but neither explains the significance of these comparisons other than to establish that the SHPD and the EAD are equal but separate divisions. Consequently, the court will deny without prejudice summary judgment on this claim because it is unable to determine whether Ali suffered an adverse employment action, whether Barash and Wilcut are appropriate comparators, how work is assigned, and the extent to which the structure of the various branches and divisions impacts work assignments.[15]

## V. TEAM LEADER NON-SELECTION & LEGISLATIVE FELLOW NOMINATION

Ali claims Hawkins discriminated against him when "she denied opportunity for [him] of Legislative Fellow (around September 21, 2010)." (Compl. at 11.) In an email, Hawkins explained to Ali that she did "not feel that [she] could write a compelling recommendation addressing [his] executive potential and need" to participate in the program because his performance had not shown that his goal to obtain a "leadership position" was a "realistic expectation." (ECF No. 22-1, Pl. Ex. C-19.)

In his response, Ali claims Hawkins "did not forward my application for the Legislative Fellow. She stated that she could not write a recommendation. She did not present any evidence that showed that she was asked by [my] superiors to write a recommendation. Denise Hawkins assertion is a pretext." (Pl. Resp. at 32) (internal citation omitted). This response fails to advance Ali's claim. He does not explain how Hawkins' decision constitutes an adverse employment action, nor does he provide comparators or performance evaluations that might undermine her stated reasons for not writing the recommendation.

---

[15]   An organizational chart showing the relationship between the relevant "divisions," "branches," and "offices," as well as the positions of the decision makers and purported comparators would assist the court in understanding the EPA organizational structure and the parties' arguments.

Ali furthers alleges that the EPA discriminated against him when he unsuccessfully sought team leader positions around February and June of 2009, as well as in April 2010, but he does not provide any specific information about these leadership opportunities. (Compl. at 14.) He also alleges that in the SHPD "[m]ostly females were given the opportunity of advancement," but he does not identify any women who were awarded the positions he sought. (*Id*.)

Hawkins testified that when Ali applied for a team leader position in 2009, she did not select him because he had not shown qualities that would have made him an effective team leader. (EEOC Tr. 186–88.) She explained that "[t]he most basic work habits that most people follow, Mr. Ali did not follow. He didn't return phone calls, he didn't read his email, he was late to meetings, or skipped meetings." (EEOC Tr. 188.)

Ali argues that the Agency has not come forward with evidence that he did not read emails or was late to meetings, (Pl. Resp. at 32), but his own appraisal of his job performance does not create a genuine issue of fact, and he did not provide or point to evidence suggesting Hawkins' reasons were pretextual.

At his deposition, Ali testified that he was more qualified for the team leader position than the person selected. (Ali Dep. 88–90; EEOC Tr. 114.) He now complains that he cannot support his case because the EPA did not provide selection information during discovery and he asks the court to sanction the agency for failing to do so. (Pl. Resp. at 33.) As discussed above, Ali's discovery challenges come too late. Without evidence that the selection of team leaders was discriminatory, Ali's team leader position claim fails.

## VI.  CONCLUSION[16]

For the reasons set forth above, by separate order, the court will DENY the Agency's summary judgment motion without prejudice on Ali's economic work assignment claim, but in all other respects the motion will be GRANTED.  The Clerk of the Court shall mail a copy of this Memorandum Opinion and the accompanying Order to the Plaintiff at his address of record.


Date:  October 19, 2020


_Tanya S. Chutkan_
TANYA S. CHUTKAN
United States District Judge

---

[16] Ali also complains that the Administrative Law Judge was biased against him because she refused to allow him to proffer witnesses during the administrative hearing after he missed a deadline. (Compl. at 15 n.5.)  Once discovery began in this lawsuit, Ali had every opportunity to depose witnesses and obtain sworn statements from any witnesses.  Thus, any complaints about the administrative hearing have no bearing on his ability to prosecute his case in this court.  More importantly, "no cause of action against the EEOC exists for challenges to its processing of a claim." _Smith v. Casellas_, 119 F.3d 33, 34 (D.C. Cir. 1997) (_per curiam_).